# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| I-FLOW LLC, ET AL.,<br><br>    **Plaintiff,**<br><br>v.<br><br>PROGRESSIVE MEDICAL, INC.,<br><br>    **Defendant.**<br>_____ | CASE NO. SACV 12-01064-AG (RNB)<br><br>**ORDER GRANTING PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT OF U.S. PATENT NO. 5,284,481 (ACCUFLO PRODUCT)** |

**INTRODUCTION**

Plaintiffs I-Flow, LLC, Kimberly-Clark Worldwide, Inc., and Kimberly-Clark Global Sales, LLC ("Plaintiffs") renew their motion for summary judgment that Defendant Progressive Medical, Inc. ("Defendant") has infringed claims 1 and 15 of U.S. Patent No. 5,284,481 (the "'481 Patent") through sales of the AccuFlo infusion pump ("Motion"). On August 21, 2013, the Court denied Plaintiffs' original motion seeking the same relief. (Order Construing Claims and Denying Pl.'s Mot. for Summ. J. ("First SJ Order,") Dkt. No. 73). In the First SJ Order, the Court held that a genuine issue of material fact remained as to whether the AccuFlo's housing was "for confining said reservoir to fill concentrically about said support member." (First SJ Order 24-25.) Plaintiffs argue that "newly emerged evidence" now demonstrates the absence of a genuine dispute as to this limitation. (Mot. 1.) Defendant opposes the renewed motion, arguing that the "for confining" limitation, and two others, are not met by the AccuFlo product. (Opp'n, Dkt. No. 138.) The Court GRANTS the Motion.

**BACKGROUND**

The '481 Patent is titled "Compact Collapsible Infusion Apparatus." The "liquid infuser apparatus comprises an elastic reservoir comprising an elastic sleeve mounted on a substantially cylindrical support member mounted within a spherical chamber of a collapsible housing." ('481 Patent 1:63-66.) Figure 1 of the '481 Patent shows a preferred embodiment of the invention:



2

('481 Patent, Fig. 1.)  Element 12 in Figure 1 is an outer collapsible non-stretchable housing or shell.  (*Id.* 2:46-48.)

Claim 1 contains the limitation "collapsible non-stretchable means for containing said support member and said pressure reservoir for enabling said pressure reservoir to expand naturally and for confining said reservoir to fill concentrically about said support member." ('481 Reexam Certificate 1:35-39.)  Claim 15 similarly provides that "first housing means includes a collapsible shell enclosing said support member and said pressure reservoir, said housing means having a size and shape for enabling said pressure reservoir to expand naturally and for confining said reservoir to fill concentrically about said support member."  (*Id.* 2:27-31.) The Court construed the phrase "for confining said reservoir to fill concentrically about said support member" to mean "for confining said reservoir to fill concentrically about said support member when the reservoir is filled substantially to the volume of the housing." (First SJ Order 15-16.)

In holding that genuine issues of material fact precluded the entry of summary judgment in Plaintiffs' favor on this limitation, the Court necessarily relied on the evidence and argument presented by the time of the First SJ Order.  Of that material, three points were particularly prominent.  First, Plaintiffs' evidence—two accused products filled such that the housing and the reservoir were largely in contact—had not been produced to Defendant's counsel before the hearing. (*Id*. 24.)  Second, Defendant argued that, among other issues, those products might have been filled beyond their normal operating parameters. (*Id*. 24-25.)  Third, the parties disputed the relevance of unusual test conditions in determining whether a product is "reasonably capable of satisfying the claim limitations." (*Id*. 25.)  In denying summary judgment, the Court stated that "'tests of an accused device under unusual conditions are not necessarily relevant to an infringement analysis,'" but because the issue of the potentially overfilled pumps was not raised until the hearing, that issue was not the focus of the briefing. (*Id*. 25 (quoting *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001).) Thus, at the time of the First SJ Order, the state of the evidence was unclear, and the parties had therefore not fully applied the relevant law to the facts.

3

**LEGAL STANDARD**

Summary judgment is appropriate only where the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 269.

Determining patent infringement is a two-step process. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). "First, the court determines the scope and meaning of the patent claims asserted . . . and then the properly construed claims are compared to the allegedly infringing device." *Id.* (citations omitted). "Whether an accused device or method infringes a claim either literally or under the doctrine of equivalents is a question of fact." *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001). A patentee claiming infringement must present proof that the alleged infringing device meets "each and every claim limitation." *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001). If a patentee meets this initial burden, the burden shifts to the accused infringer to "to designate specific facts showing that there is a genuine issue for trial." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citing *Celotex*, 477 U.S. at 323).

*//*
*//*
*//*

4

**ANALYSIS**

While Plaintiffs' Motion sought only to prove the presence of the one limitation left unresolved in the First SJ Order, Defendant opposes the motion on three grounds: First, that the AccuFlo's housing does not "confine" the reservoir. Second, that the AccuFlo's housing does not confine the reservoir "to fill concentrically about said support member." Third, that Plaintiffs have not shown that the AccuFlo dispenses liquid at "a substantially constant flow rate" when overfilled. The Court addresses each argument in turn.

**1.     THE ACCUFLO'S HOUSING "CONFINES" THE RESERVOIR**

    **1.1     The "Confining" Functionality is Seen at Particular Fill Volumes**

Regarding this limitation, the parties dispute the law, not the facts. The parties agree that the housing only actually confines the reservoir when it is filled beyond the AccuFlo's stated and recommended capacities. (Mot. 3-5, 6-7, Opp'n 7-9.) Plaintiffs rely on the report and testimony of Defendant's expert witness, Dr. Hari K. Kytomaa. (Mot. 3-5.) Kytomaa measured the pressure-volume relationship of 100ml AccuFlo pumps as they were filled with and without the housing to determine if and when the housing confined the reservoir. (Decl. of Boris Zelkind in Supp. of Mot. ("Zelkind Decl."), Dkt. No. 123, Ex. 3, Kytomaa Rebuttal Rep. 33-36.) The 100ml AccuFlo has a nominal volume of 100ml and a maximum recommended volume of 120ml. (*Id*. 20-21, 32.) When the AccuFlo's housing is removed, the pressure remains essentially constant as it is filled to three times the nominal fill volume:



Figure 20. Pressure vs. volume relationship for the AccuFlo pump (model CT-2000-100) with the outer housing removed. The nominal fill volume was 100 mL. Two tests were performed.

(*Id.* 36.) By contrast, when the housing is in place, the pressure increases at about 175ml:



Figure 19. Pressure vs. volume relationship for the AccuFlo pump (model CT-2000-100). The nominal fill volume was 100 mL. Two tests were performed.

(*Id*. 35.) Because of the difference in the "with housing" and "without housing" measurements, Kytomaa concludes that the increase in pressure shown in his figure 19 results from the presence of the housing—that the housing is confining the reservoir when the fill volume reaches 175ml. (*Id*. 35, Zelkind Decl. Ex. 2, Nov. 12, 2013 Deposition of Harri Kytomaa ("Kytomaa Dep.") 91:7-92:19.) Further, Kytomaa agrees that there is no mechanical device on the AccuFlo that limits the fill volume. (Kytomaa Dep. 146:9-147:3.) Both sides argue that these undisputed facts support their infringement positions.

### 1.2 The Parties Take Contrary Views of the Law

Plaintiffs point to the Court's statement in the First SJ Order that "if there is **always** enough space between the AccuFlo's housing and bladder, such that the housing **never** 'confines the bladder to fill concentrically around the support member,' then it does not meet the "for confining" limitation. (Mot. 3 (quoting First SJ Order 24-25).) Now, given Kytomaa's report and testimony, Plaintiffs argue it is undisputed that the housing confines the bladder in certain circumstances, and is therefore always a housing "for confining." (Mot. 7.)

Defendant responds that because the AccuFlo's housing only confines its reservoir when filled beyond its stated and recommended volumes, and given its nature as a regulated medical device filled by pharmacists, it is not "reasonably capable" of infringement. (Opp'n 19-20.) Defendant argues that Plaintiffs have not been able to find a single instance in the real world in which a pharmacist has overfilled an AccuFlo. (*Id*. 2-3.) Defendant argues that FDA regulations, medical standards, patient safety considerations, and pharmacist professional standards are all highly effective "mechanisms" that prevent overfilling, thus preventing the AccuFlo from meeting the "confining" limitation in realistic conditions. (*Id*. 2.) Plaintiffs respond that "evidence of actual use of a device in an infringing manner is not required to prove infringement of a device claim that recites a capability." (Reply 7.) To resolve this dispute about the proper standard to apply, the Court now examines the governing cases.

7

**1.3     The AccuFlo Contains the Infringing Capability Under "Normal Conditions"**

In *Intel Corp. v. United States Int'l Trade Comm'n*, the accused infringer argued that its memory chips did not infringe because, although they were "capable" of operating in an infringing mode, they were not sold to operate in that mode, no customer was ever told how to convert the chips to that mode, and no customer was even told that such conversion was possible.  946 F.2d 821, 832 (Fed. Cir. 1991).  The Federal Circuit held that because the language of the claim referred to "programm*able* selection means" and required a condition to be fulfilled "*when* said alternate addressing mode is selected," the accused device need only be *capable* of operating in the infringing mode, and that actual operation in the infringing mode is not required to infringe.  *Id*. (emphasis in original).

The Federal Circuit clarified that rule in *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, where the accused device met a "rotatably coupled" limitation only when two set screws that attached the camera to its housing were loosened.  49 F.3d 1551, 1553 (Fed. Cir. 1995).  The court found non-infringement, rejecting the argument that "if a particular device can be altered without undue difficulty to operate in an infringing manner, the device as sold, must be deemed to infringe."  *Id*. at 1555-56.  The court noted that in *Intel*, the claim only required that the memory chip be "programmable" to operate in the designated mode.  *Id*.  Thus, the claim in *Intel* read on the accused device, as made and sold, but the accused camera in *High Tech Medical* did not meet the limitation unless it was altered after sale by removing or loosening the set screws.  *Id*. at 1556.  And there was no reason to disregard those screws in determining the character of the coupling between the camera and its housing.  *Id*.

Therefore, "that a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement*.*"  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2002) (citing *High Tech Medical*, 49 F.3d at 1556).  Where a claim recites a capability, a device need not ever carry out that capability to infringe, but the fact that a device could be modified to infringe is insufficient.  The Federal Circuit recapitulated these principles in holding that "in every infringement analysis, the

1  language of the claims, as well as the nature of the accused product, dictates whether an
2  infringement has occurred." *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d
3  1108, 1118 (Fed. Cir. 2002) (holding that to infringe a claim requiring functions to be completed
4  by computer software, the accused software must be written to include those functions, such that
5  "the user is only activating means that are *already present in the underlying software*.").

6        These cases form the basis for Plaintiffs' charge of infringement against the AccuFlo, in
7  which the housing is capable of confining the reservoir without modification. To demonstrate
8  the existence of that capability, all that is required is for the reservoir to be overfilled some 55ml
9  over the 120ml recommended maximum volume (in the 100ml version of the product). But
10 because Plaintiffs have not identified a single real-world instance in which an AccuFlo was
11 overfilled to that level, the parties debate the relevance of those fill levels in light of the Federal
12 Circuit's holding "that tests of an accused device under unusual conditions are not necessarily
13 relevant to an infringement analysis." *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343
14 (Fed. Cir. 2001).

15       *Hilgraeve* involved antivirus software, and the claim in question required the software to
16 screen data as it was being transferred before "the incoming digital data [are] sufficiently present
17 on the destination storage medium and accessible by the operating system or other programs so
18 that any viruses contained in the data can spread and infect the computer system." *Id*. at 1342.
19 The defendant unsuccessfully sought to show noninfringement based on four tests in which the
20 limitation was not met. *Id*. In all four tests, the expert actively prevented the software from
21 performing the claimed function. *Id*. at 1343-44. In the first test, the expert downloaded an
22 infected file, but before the software could scan and delete it, shut off power to the computer,
23 and was then able to access the file with a utility program when he turned the computer back on.
24 *Id*. at 1333. The second test was the same as the first, except that the expert restarted the
25 computer instead of turning it off. *Id*. In the third test, the expert ran two antivirus programs on
26 the same computer, and showed that the second antivirus program intercepted the file before the
27 accused software could. *Id*. at 1344. In the fourth test, the expert loaded "a special program for
28 intercepting a particular file while the file is being downloaded and redirecting the file to the

computer's storage medium." *Id*. The court held that these tests, all of which involved active interference with the normal operation of the software, did not prove non-infringement of the asserted method claim. *Id*. at 1343-44.

In *Hilgraeve*, non-infringement was found in unusual circumstances, but here, **proof** that the infringing capability exists is found in unusual circumstances. Those are not the same. This case involves an apparatus claim that requires only that the accused device have the capability "for confining said reservoir to fill concentrically about said support member when the reservoir is filled substantially to the volume of the housing." That capability is present at all times, even if the device must be filled to a particular level to prove it.

The Federal Circuit drew this distinction in *Finjan, Inc. v. Secure Computing Corp.*, which held that software infringed where it contained infringing software modules that were locked. 626 F.3d 1197, 1205 (Fed. Cir. 2010). In so holding, *Finjan* quoted *Fantasy Sports*'s statement that "in every infringement analysis, the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred." *Finjan*, 626 F.3d at 1204 (quoting *Fantasy Sports*, 287 F.3d at 1118). Defendant argues here that "the nature of the accused product" shows noninfringement, because the AccFlo is a regulated medical device that is carefully used according to its instructions. (Opp'n 6-7.) Defendant's argument takes the quote out of context: the next sentence in *Finjan* is "[**a**]**ccordingly**, we have held that, to infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode." 626 F.3d at 1204 (quoting *Intel*, 946 F.2d at 832). Therefore, *Finjan* is properly read to encourage focus on both the precise requirements of the claims and the structure of the accused product, not, as Defendant urges, to invite a free-floating inquiry into the accused product's intended use.

Thus, the "unusual circumstances" that may not be relevant to infringement are not the same as uncommon uses of a device. As applied in the Federal Circuit's decisions, the question is whether a test has interfered with or altered the device as sold from the perspective of the claims. Here, no modification to the accused device is needed to make it capable of "confining said reservoir to fill concentrically about said support member when the reservoir is filled

10

substantially to the volume of the housing," which Kytomaa found was at about 175 ml. (Kytomaa Dep. 98:6-99:3.) All Kytomaa needed to do for actual confining to occur was to keep pushing in more fluid, which did not break or alter the AccuFlo. (*Id*. 147:5-148:2.) Indeed, as shown by Kytomaa's test of filling the reservoir after removing the housing, the reservoir is capable of accommodating at least 300 ml—three times the normal fill volume. (Kytomaa Rebuttal Rep. 35-36.) That demonstrates that the AccuFlo has the infringing capability under normal circumstances. *See Baran v. Med. Device Techs., Inc.*, 666 F. Supp. 2d 776, 810 (N.D. Ohio 2009) (O'Malley, J.), *aff'd*, 616 F.3d 1309 (Fed. Cir. 2010) (finding infringement where device could be used in alternative manner without modification, and holding irrelevant the question of whether physicians or other users of the device actually used the alternative method). The claims at issue do not provide that the "confining" limitation occur only when the device is filled to its nominal or recommended fill volume, so the fact that the confining only actually occurs at a greater volume is irrelevant.

Given the language of the claims—which recite a device, not its use—the focus must remain on the AccuFlo itself, not methods or instructions for its use. In that sense, this case is similar to *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1370 (Fed. Cir. 2009). *Revolution Eyewear* involved a patent that required an eyeglass frame with "magnetic members capable of engaging second magnetic members of an auxiliary spectacle frame," for example, a magnetic type of clip-on sunglasses. *Revolution Eyewear* upheld a verdict of infringement even though the only auxiliary frames that were shown capable of "engagement" with the accused frames were specially made for litigation to demonstrate infringement. *Id*. at 1369-70. Just as in this case, the infringing capability present in the accused device was never utilized in the real world:

> Just like the accused product in *Intel*, Revolution's primary frames, although not specifically designed or sold to be used with top-mounting auxiliary frames, are nevertheless capable of being used in that way—the three specially made auxiliary frames proved so. **It is irrelevant that Revolution's auxiliary frames, or any**

11

**other commercially available auxiliary frames, are not actually used in a top-mounting configuration or cannot be so used.**

*Id.* at 1379 (emphasis added). Like in *Revolution Eyewear*, no modification to the accused device is necessary for it to infringe. Therefore, summary judgment in favor of Plaintiffs on this limitation is proper—unless, as Defendant argues, Plaintiffs are estopped from taking their present position. The Court now turns to that question.

### 1.4 Plaintiffs Are Not Estopped from Arguing that The AccuFlo Infringes During "Normal Conditions"

Defendant argues that judicial estoppel should apply to prevent Plaintiffs from arguing that the infringement analysis need not be "taken in the context" of how the device is used in "normal" operation because they prevailed on that argument in earlier litigation about the '481 Patent. (Opp'n 23.) While there at first appears to be some tension between Plaintiffs' argument in the two cases, upon closer inspection, the arguments are not in direct conflict. There is an important distinction between the types of "abnormal" use Plaintiffs discussed in this and the earlier case.

"Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996). The Supreme Court, while not establishing "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," has held that three factors typically govern:

> First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled." Absent success in a prior proceeding, a

>party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (citations omitted).

Defendant cites to trial testimony given by Plaintiff I-Flow Corporation's witness in *I-Flow Corp. v. Apex Med. Techs.*, No. 07CV1200-DMS (S.D. Cal.) ("*Apex*"). (Opp'n 23, Decl. of Raymond P. Niro, Jr. in Supp. of Opp'n ("Niro Decl."), Ex. 12, Dkt. No. 150, *Apex* October 13, 2009 Trial Tr.) That testimony concerned the limitation "collapsible non-stretchable housing means," which the *Apex* court construed to mean "a shell or cover that is not rigid and cannot be permanently stretched, including elastic or semi-elastic materials." (Reply 8 n.2, Zelkind Reply Decl. Ex. 6, *Apex* Claim Construction Order at 5:14-6:14.) I-Flow's expert, Dr. Loomis, testified that the accused pump met this limitation. (Reply 8 n.2.)

On cross-examination, Loomis testified that while he was not sure what material the accused pump was made of, he thought it was an elastomeric polyurethane. (Niro Decl. Ex. 12, *Apex* October 13, 2009 Trial Tr. 888.) Opposing counsel then asked Loomis whether polyurethane can be permanently stretched—that is, counsel tried to get Loomis to admit that the accused product cover did not meet the limitation as construed. (*Id*.) Loomis responded that while "anything can be permanently stretched when you get beyond what you call the elastic limit," the accused housing "is not permanently stretched within the little bit of elongation that you are giving it" "within the use of the device." (*Id*. 889.) Loomis noted that when the accused device's bladder was "totally filled up," the sleeve was "barely stretched," and thus not "anywhere near the elastic limit of the material" and that "it would have to exceed the elastic limit to be permanently stressed." (*Id*.)

Counsel then pressed Loomis, asking "[w]here in the claim construction does it say within operating parameters?" (*Id*.) Loomis replied that "[i]t is implicit in the claim construction that it is within operating parameters. Otherwise you could take a piece of metal,

13

you could take a piece of iron and permanently stretch it" so it is "absolutely implicit that . . . . non permanently stretchable means within the limits of the use of the material in the device . . . . within its normal mode of operation." (*Id*. 890) Loomis then fielded questions about whether dropping pumps out of a helicopter at 150 feet was within normal operating parameters, which apparently related to testing that was actually performed. (*Id*. 890-91.) Loomis responded that he was talking about "the use of the pump that is defined" in the claim, "even when the bladder is completely filled." (*Id*. 891.)

Thus, in context, the "normal use" Loomis discussed at the *Apex* trial was filling the pump with liquid; he did not argue that "normal use" only encompassed filling the pump to the nominal or recommended volume. The "abnormal use" at issue in this case is filling the pump with liquid, not dropping it out of a helicopter. The positions are not clearly inconsistent. Judicial estoppel does not apply.

**2.     THE ACCUFLO MEETS THE "CONCENTRIC" LIMITATION**

Defendant argues that even if the AccuFlo's cover is "for confining" the reservoir, it still does not meet the entire limitation: "for confining said reservoir to fill concentrically about said support member." (Opp'n 15.) Defendant argues that when the AccuFlo's cover is removed, the reservoir still fills concentrically, so the housing cannot be **causing** the concentric filling. (*Id*.) Defendant proffers the following three photographs from Kytomaa's report illustrating the AccuFlo without its housing:

//
//
//



Figure 16. Photographs of the AccuFlo pump (model CT-1000-100) with the housing removed at three different fill levels: unfilled (0 mL), nominal fill volume (100 mL), maximum fill volume (120 mL).

(Opp'n 15.)

Defendant ignores the growing lack of concentricity seen between the 100ml (nominal fill) and 120ml (maximum recommended fill) photographs. But more importantly, Defendant's argument ignores two aspects of the Court's construction. The Court construed "for confining said reservoir to fill concentrically about said support member" to mean "for confining said reservoir to fill concentrically about said support member **when the reservoir is filled substantially to the volume of the housing**." (First SJ Order 15-16 (emphasis added).) First, as shown by the pressure/volume relationship discussed in Section 1.1, the reservoir is not filled substantially to the volume of the housing at 100 ml or 120 ml, so Defendant's evidence, which does not address the 175 ml and above fill level, is irrelevant.

Second, the construction does not require the housing to be the sole cause of concentric filling. From Kytomaa's report, it is clear that the housing, by exerting pressure on the reservoir to maintain a concentric shape while filling at substantially the volume of the housing, causes the reservoir to fill concentrically at that point. "The change in slope of the pressure-volume

1 relationship indicates the volume at which the housing begins to confine the expansion of the
2 elastic sleeve.  Consistent with visual observations, this occurs well above the nominal fill
3 volume of 100 mL and the maximum fill volume of 120mL."  (Kytomaa Rebuttal Rep. 35.)  Due
4 to the shape of the housing, that confining is concentric about the support member.

Therefore, the AccuFlo meets the "for confining said reservoir to fill concentrically about said support member" limitation.

### 3. THE "SUBSTANTIALLY CONSTANT FLOW RATE" PREAMBLE

Defendant argues that Plaintiffs have not shown that the AccuFlo meets the "substantially constant flow rate" limitation found in the preamble to the asserted claims when overfilled such that the housing confines the reservoir.  (Opp'n 18-19.)  The preambles of both claims 1 and 15 state: "A compact portable apparatus for dispensing a liquid under pressure at a substantially constant flow rate over a period of time comprising . . . . "  ('481 Patent Reexamination Certificate 1:26-28, 2:13-15.)  Plaintiffs argue that Defendant waived this argument by not including it in its noninfringement interrogatory responses and by not articulating it at the meet and confer on this Motion.  (Reply 11.)  Because the argument appears to be based on an evolving understanding of the facts in light of the Court's claim construction and Plaintiffs' elaborated arguments, the Court will consider Defendant's argument.

On the merits, Plaintiffs respond that the preamble is not a limitation, and so they need not prove that it is met by the AccuFlo.  (Reply 10-11.)  Plaintiffs argue that the preamble is not limiting because the patent "defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."  (Reply 10 (quoting *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).)

Courts resolve whether a preamble is a limitation "only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim."  *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1257 (Fed. Cir. 1989).  "No litmus test defines when a preamble limits claim scope."  *Catalina*

*Mktg.* 289 F.3d 801 at 808. But "[a]bsent clear reliance on the preamble in the prosecution history, or in situations where it is necessary to provide antecedent basis for the body of the claim, the preamble 'generally is not limiting.'" *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008) (quoting *Catalina Mktg.,* 289 F.3d 801 at 809). Thus, on the one hand, a preamble is a claim limitation if it recites essential structure or steps, or if it "is necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). On the other hand, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997).

Because (1) the body of claims 1 and 15 define a structurally complete invention, (2) the preambles are not necessary to provide antecedent basis for the body of the claim, and (3) "dispensing a liquid under pressure at a substantially constant flow rate" recites a purpose of the invention, the Court holds that the preamble is not a limitation.

Further, even if the preamble was a limitation, it does not require that the substantially constant flow rate exist at all times or at all fluid levels. So, Defendant's citation to the AccuFlo's product label would not preclude the entry of summary judgment. (Opp'n 19 ("See the list above for maximum and minimum volume predetermined for the device. This defines the range that will not appreciably affect the flow rate.").) And Defendant itself previously emphasized the AccuFlo's constant flow rate, so there would be no genuine dispute that the AccuFlo meets such a limitation. *See, e.g.,* Def.'s Opp'n to Pl.'s Original Mot. for Summ. J., Dkt. No. 45 at 2 ("One improvement resulting from the unique support core design in the AccuFlo product is that fluid is delivered at a considerably more constant flow rate in comparison to the fixed core of the I-Flow product.").

**4.      DEFENDANT'S OBJECTIONS TO THE MASSENGALE DECLARATION**

Defendant requests that the Court strike or discount the declaration of Roger Massengale submitted by Plaintiffs in support of the Motion. (Opp'n 9.) The request is based on Massengale's deposition testimony, where he admitted that he did not know who took any of the photographs in his declaration, did not personally fill the Redi-Flo pumps with fluid, did not know who did fill the pumps, and did not know whether the fill volume exceeded the nominal or maximum fill volumes. (Opp'n 10-12 (quoting Niro Decl. Ex. 4, Nov. 26, 2013 Massengale Dep. at 43-45, 109-110, 113-114, 116.)

Defendant highlights its counsel's effective cross-examination. This Court has often remarked on the overuse of *Daubert* motions in the face of *Daubert's* own embrace of "vigorous cross-examination" as the remedy for "shaky but admissible evidence." *Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579, 596 (1993). The cited cross-examination would likely carry weight with a fact-finder, but Defendant has not raised any issues that would require the Court to take action concerning the Massengale Declaration.

**DISPOSITION**

Plaintiffs' Renewed Motion for Summary Judgment that Defendant's AccuFlo product infringed U.S. Patent No. 5,284,481 is GRANTED.

IT IS SO ORDERED.

DATED: January 7, 2014

_____
                    Andrew J. Guilford
                    United States District Judge